UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑

TANIT BUDAY,

Plaintiff,

- against -

NEW YORK YANKEES PARTNERSHIP, an Ohio
Limited Partnership,

Defendant.

‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑

**11 CV 2628**

Index No.

**COMPLAINT
AND
DEMAND FOR JURY TRIAL**

## INTRODUCTION

1.     This is an action by Plaintiff, Tanit Buday, as the assignee of Kenneth Timur, to recover damages as a result of, *inter alia*, the Defendant's copyright infringement, unjust enrichment and conversion of Plaintiff's property.

## THE PARTIES

2.     Plaintiff, Tanit Buday, (hereinafter referred to as the "Plaintiff") is an individual, residing in New York.

3.     Upon information and belief, defendant, New York Yankees Partnership (hereinafter referred to as the "Defendant" or the "New York Yankees" or, simply, the "Yankees") is an Ohio limited partnership registered to do business in the State of Ohio, which owns and operates the "New York Yankees" Major League Baseball Club.

4.     Upon information and belief, the nerve center of the New York Yankees is Tampa, Florida, the residence of Hal Steinbrenner, a son of the late George Steinbrenner, III, and the individual who controls the Defendant. Moreover, Defendant maintains its corporate offices, minor league training complex, and injury rehabilitation facilities in Tampa, Florida.

## JURISDICTION AND VENUE

5.      The claims for relief herein exceed the sum or value of $75,000, exclusive of interests and costs and without considering counterclaims.

6.      Jurisdiction for this action is founded upon diversity jurisdiction under 28 U.S.C. § 1332 and venue is proper pursuant to 28 U.S.C. § 1391 because the claim arises from events that took place in this district and the New York Yankees are subject to personal jurisdiction in this district.

## GENERAL ALLEGATIONS

7.      Kenneth Timur (hereinafter referred to as "Timur") is an individual who resided in Brooklyn, New York and is now deceased.

8.      Timur was the uncle of the Plaintiff.

9.      Timur's expertise was as an innovative Graphic Illustrator, Heraldry and Calligraphy, Letterer and Cartoonist.

10.     Timur had a sister who was a manicurist.  Her name was Stella.

11.     Stella's customers included Jacob Ruppert and Del Webb, then owners of the Yankees.

12.     In 1936, Mr. Ruppert told Stella that the Yankees needed someone with fresh ideas to create a new logo for the Yankees.

13.     Stella told Mr. Ruppert about her brother's expertise.

14.     As a result, Timur was commissioned by Mr. Ruppert on behalf of the Yankees to create a logo.

15.     As requested by the Yankees, Timur created a logo which incorporated the well known and recognized Top Hat and Bat (hereinafter referred to as the "Yankees Top Hat Logo", "Top Hat Logo" or simply "Logo").

16.     As is clear from an examination by a qualified art expert of both the Top Hat Logo created by Timur with the top hat logo currently in use by the Yankees, it is unmistakably evident that they are so significantly similar that they could easily be interpreted as being the same logo.

17.     Stella, on behalf of Timur, who was then living and working as a graphic illustrator in Europe, presented Timur's Yankees Top Hat Logo to Mr. Ruppert and he accepted it on behalf of the Yankees. However, Timur received no remuneration or recognition for his creation of this Yankees Top Hat Logo.

18.     Timur was unaware the Yankees were using his Top Hat Logo until he emigrated to New York City in 1947.

19.     In that year, Mr. Webb, on behalf of the Yankees, commissioned Timur to revise the Yankees Top Hat Logo in anticipation of the fact that in 1952 the Yankees would celebrate 50 years based in New York City.

20.     Again Timur complied.

21.     Defendant had acquired influence over Timur and his sister Stella and they had trust and confidence in the Yankees. Timur and his sister Stella believed that this time Timur would receive remuneration and recognition for his Yankees Top Hat Logo artwork. It never occurred to the trusting Timur to retain an attorney as with his modest income he could not afford one.

22.     Heraldry is an intricate and specialized system of identification. It is an ancient art form used to identify persons having something in common, for example, a family crest identifies the members of a family.

23.     Timur was a modern day herald.  For him the Yankees Top Hat Logo was a heraldic crest identifying the members of the Yankees' baseball team.

24.     Only the herald Timur had the expertise to revise the Yankees' "crest" so the Yankees had to come back to him.

25.     In 1947, Timur created a second original artwork of his Yankees Top Hat Logo for the Yankees which combined in close union the date "1952" and the lettering "50th Year".

26.     Since Timur had not been remunerated or recognized for his prior Yankees Top Hat Logo artwork, Timur took the opportunity to "sign" his Yankees Top Hat Logo artwork with his signature "P" to identify himself as the creator of the Yankees Top Hat Logo.

27.     Timur did this by substituting his signature  letter "P" for the numeral "9" in the year "1903" so that the period from 1903 to 1952 appeared on the Yankees Top Hat Logo as "1P03-1952".

28.     Timur was known to "sign" his artwork with a "P".

29.     The "P" is an established signature that has appeared on other Timur artworks.

30.     Timur's act of signing his artwork with a "P" has been observed by credible witnesses.

4

31.     Timur communicated with the Yankees on at least two occasions in the 1950s to assert his rights for recognition and remuneration.  He was unsuccessful.

32.     With his limited resources, Timur was unable to pursue his claims against the rich and powerful Yankees.

33.     As a result, Timur shared only with Plaintiff the Yankees Top Hat information and his desire for the recognition and remuneration that is due to him.

34.     By 1960 Timur had not received any remuneration or recognition for his Yankees Top Hat Logo and, as a result, Timur and Plaintiff had lost any of the trust and confidence that they may have previously had in the Yankees.

35.     Since 1995 to the present, Plaintiff, who is a writer, has devoted significant time, effort, and professional skill to conduct a thorough and extensive in-depth investigation into the Timur Yankees Top Hat Logo including, without limitation, interviewing, either in person or by telephone, baseball historians, visiting libraries to read baseball books and magazines, examining baseball photographs from archives, reading baseball newspaper articles stored on microfilm in libraries and researching internet sources.

36.     In 1997, Plaintiff interviewed, either in person or by telephone, David Sussman, a General Counsel and Chief Operating Officer of the Yankees, Andrew D. Baharlias, a trademark attorney for the Yankees, and Lonn A. Trost, a General Counsel and Chief Operating Officer of the Yankees.

37.     As a result of this thorough and extensive in-depth investigation and as is evident from the next following allegations, Plaintiff is able to plead facts that clearly show that the claims alleged are, as required, plausible on their face.

38.     Timur's "signed" **"1P03-1952"** Yankees Top Hat Logo appears on patches on the uniforms of Yankee players in photographs which have been published by the Yankees. See, Dickson, Paul. <u>Baseball's Greatest Quotations</u>. New York: Edward Burlingame Books - HarperCollins Publishers (1991) at page 416.   ISBN 0062700014.

39.     Attached hereto as Exhibit B is a copy of a photograph of Casey Stengel in his New York Yankees uniform which clearly shows the Timur **"1P03"** signature in the Yankees Top Hat Logo.

40.     Attached hereto as Exhibit C is page 416 previously referenced in <u>Baseball's Greatest Quotations</u>, *supra*, which contains a cropped version of Casey Stengel's photograph.

41.     This Casey Stengel photograph conclusively demonstrates the fact that the Yankees Top Hat Logo created and signed **"1P03"** by Timur is embroidered on the left shirt sleeve on the uniforms of Yankee players.

42.     Attached hereto as Exhibit 5 to Exhibit A is an image of the Yankees Top Hat Logo created and signed **"1P03"** by Timur on the left shirt sleeve uniform of Casey Stengel upon which there has been superimposed the logo currently in use by the Yankees.  Based on the "Y" and "a" visible in the Timur logo and as well as other elements, it seems that both logos use an almost identical and very distinctive scripted type style for the word "Yankees".  In addition to the great similarity in the number of elements, their size and orientation to one another, the actual elements themselves are significantly similar.  The letter type style of the word "Yankees" is virtually identical across both logos.

43.     The similarities of the Timur Yankees Top Hat Logo signed "1P03" on the left shirt sleeve uniform of Casey Stengel with the logo currently in use shows that the Yankees Logo currently in use is clearly a derivative of the Top Hat Logo signed and created by Timur.

44.     The New York Yankees understood the value of including Timur's distinctive "P" signature on their Yankees Logo and uniform patch. It could not have been accidental.

45.     In 1947, Timur took his revised Yankees Top Hat Logo to the Yankees and showed it to them.

46.     Timur agreed to transfer his Yankees Top Hat Logo to the Yankees and they agreed to remunerate and recognize Timur for his Yankees Top Hat Logo.

47.     The New York Yankees failed to give Timur the recognition and remuneration as the creator of the Yankees Top Hat Logo to which he was entitled as agreed.

48.     The New York Yankees had actual knowledge of the wrongfulness of the conduct alleged in the following allegations of this Complaint.

49.     The New York Yankees had actual knowledge of the high probability that injury or damage to Plaintiff would result.

50.     Despite that knowledge, the New York Yankees intentionally pursued that course of conduct.

51.     Alternatively, the conduct of the New York Yankees was so reckless and wanton in care that it constituted a conscious disregard or indifference to the

rights of Timur and the Plaintiff, and directly and proximately caused substantial injury to Timur and the Plaintiff.

## EXPERT REPORT FINDINGS

52.     On February 21, 2011 Plaintiff retained Rob Wallace of Wallace Church, Inc. to analyze the Top Hat Logo created for the New York Yankees by Kenneth Timur with the logo that the New York Yankees currently have in use and in broad distribution.

53.     Mr. Wallace, managing partner of Wallace Church, Inc., has more than twenty years of expertise in all aspects of visual branding strategy and design analysis for national and global brands.

54.     Mr. Wallace's Report concluded "[i]t is unmistakably clear that the Timur logo and the logo in use are so significantly similar that they could not have been created independently from one another.  One is clearly derived from the other.  If, in fact, the Timur logo predates the logo in use, then the logo in use is an unmistakable derivation of the Timur original."

55.     A complete copy of the Wallace Report, dated February 21, 2011, with Exhibits, is annexed hereto as Exhibit A and made a part hereof.

## COUNT ONE

### (Infringement of Copyright)

56.     Plaintiff repeats and realleges paragraphs 1. through 55. as if fully set forth herein.

57.     Defendant never remunerated or recognized Timur for his two Yankees Top Hat Logos.

8

58.     Timur transferred to Plaintiff the rights to the Yankees Top Hat Logo and all related claims during his lifetime.

59.     Except as provided in the preceding allegation, neither Timur nor Plaintiff have ever published or transferred the Yankees Top Hat Logo and therefore retained their rights of ownership of the Yankees Top Hat Logo.

60.     Timur did not register his Yankees Top Hat Logo as a statutory copyright.

61.     Timur had a common law copyright.

62.     The assignment of a common law copyright need not be in writing. The assignment of a common law copyright may be oral or implied by conduct.

63.     During the 1960s, and after Timur had lost his confidence and trust in the Yankees, he told Plaintiff that his claims against the Yankees now belonged to her in the hope that she would pursue them.

64.     Thereupon and, on his own initiative, Timur furnished Plaintiff with the material, artworks, information and history relating to his creation of his Yankees Top Hat Logo and theft of Timur's Yankees Top Hat Logo by the Yankees which conduct, according to law, suffices to "imply" an assignment of his common law copyright and related claims to the Plaintiff.

65.     Timur also gave Plaintiff various pieces of his artwork which contained his distinctive **"P"** artwork signature.

66.     On numerous occasions during the 1960s, Timur's conduct indicated his wish that Plaintiff continue to act to protect and enforce the copyright interests with respect to his Yankees Top Hat Logo designs.

67.    By reason of the aforesaid, Timur made an assignment in and with respect to his copyright interests in his Yankees Top Hat Logo design and all related claims to Plaintiff.

68.    Plaintiff owns the Yankees Top Hat Logo copyright.

69.    Plaintiff's Yankees Top Hat Logo copyright is valid.

70.    Defendant had access to the Yankees Top Hat Logo.

71.    The Yankees Top Hat Logo used by the Defendant is substantially similar to the Timur Yankees Top Hat Logo owned by the Plaintiff.

72.    Defendant copied the Yankees Top Hat Logo without authorization.

73.    Defendant has been infringing the Top Hat Logo copyright for the past 75 years to the present.

74.    Plaintiff has been damaged in an amount to be determined at trial.

75.    Upon information and belief, additional facts which support this Count exist, but are in the exclusive possession, custody and control of Defendant. As such, additional discovery is needed to amplify these facts.

## COUNT TWO

### (Unjust Enrichment)

76.    Plaintiff repeats and realleges paragraphs 1. through 75. as if fully set forth herein.

77.    By creating and delivering the Yankees Top Hat Logo to the Defendant, Timur has conferred a benefit on the Defendant.

78.    Defendant has knowledge of such benefit.

79.     The circumstances render the Defendant's retention of the benefit inequitable unless the Defendant pays to the Plaintiff the value of the benefit for the use of the Yankees Top Hat Logo.

80.     Defendant received something of value from Timur for which they have not provided any remuneration or recognition.

81.     Plaintiff has been damaged in an amount to be determined at trial.

82.     Upon information and belief, additional facts which support this Count exist, but are in the exclusive possession, custody and control of Defendant. As such, additional discovery is needed to amplify these facts.

## COUNT THREE

### (Conversion)

83.     Plaintiff repeats and realleges paragraphs 1. through 82. as if fully set forth herein.

84.     Defendant's use of the Timur Yankees Top Hat Logo was not authorized either by Timur or the Plaintiff.

85.     This unauthorized use of the property represented by the Yankees Top Hat Logo by the Defendant deprived first Timur and then Plaintiff of the property for an indefinite time.

86.     The deprivation is inconsistent with Plaintiff's ownership interest in the Yankees Top Hat Logo.

87.     In other words, the Defendant converted the property by using the Yankees Top Hat Logo without the authorization of either Timur or the Plaintiff.

88.     Plaintiff has been damaged in an amount to be determined at trial.

89.    Upon information and belief, additional facts which support this Count exist, but are in the exclusive possession, custody and control of Defendant. As such, additional discovery is needed to amplify these facts.

## COUNT FOUR

### (Breach of Contract)

90.    Plaintiff repeats and realleges paragraphs 1. through 89. as if fully set forth herein.

91.    Timur had a valid and existing contract with the Defendant.

92.    The contract was to give Timur recognition and remuneration for his innovative Yankees Top Hat Logo artwork.

93.    The conduct of Defendant which resulted, in *inter alia*, the Defendant's copyright infringement, unjust enrichment and conversion of Plaintiff's property was a breach of such contract.

94.    The Defendant's alteration of the current Yankees Top Hat Logo was an obvious effort to conceal Timur's identity as the sole creator of the Yankees Top Hat Logo from the public-at-large.

95.    Defendant has fraudulently concealed its aforesaid bad faith and wrongful acts from the public-at-large from 1936 and continuing to present thereby denying Timur of the recognition and remuneration to which Timur was entitled under the contract with the Defendant.

96.    As a result of such breach, Plaintiff has been damaged in an amount to be determined at trial.

97.     Upon information and belief, additional facts which support this Count exist, but are in the exclusive possession, custody and control of Defendant. As such, additional discovery is needed to amplify these facts.

## COUNT FIVE

### (Quantum Meruit)

98.     Plaintiff repeats and realleges paragraphs 1. through 97. as if fully set forth herein.

99.     Alternatively, there was no express agreement between Timur and the Defendant to remunerate him and to recognize him for the creation of the Timur Yankees Top Hat Logo.

100.    Timur provided a benefit in the form of the Yankees Top Hat Logo which was accepted by the Defendant.

101.    Under ordinary circumstances a reasonable person would reasonably expect to pay for such benefit and use.

102.    Defendant failed to pay for the benefit of the creation and use of the Yankees Top Hat Logo.

103.    Plaintiff has been damaged in an amount to be determined at trial.

104.    Upon information and belief, additional facts which support this Count exist, but are in the exclusive possession, custody and control of Defendant. As such, additional discovery is needed to amplify these facts.

## COUNT SIX

### (Breach of Fiduciary Duty)

105.     Plaintiff repeats and realleges paragraphs 1. through 104. as if fully set forth herein.

106.     Defendant acquired influence over Timur and Timur had trust and confidence in Defendant.

107.     The conduct of Defendant which resulted in, *inter alia*, the Defendant's copyright infringement, unjust enrichment and conversion of Plaintiff's property was a breach of such trust and confidence.

108.     Thus Defendant owed Timur fiduciary duties with respect to his creation of his Yankees Top Hat Logo.

109.     Defendant owed Timur fiduciary duties by denying Timur public credit and recognition for his iconic Yankees Top Hat Logo and failing to offer him any remuneration or recognition for his valuable Yankees Top Hat Logo artwork.

110.     The facts giving rise to Defendant's breach of fiduciary duties to Timur have still not ceased to be operational as Defendant continues to conceal their theft, bad faith and wrongful conduct from the public-at-large.

111.     As a result of such breach Plaintiff has been damaged in an amount to be determined at trial.

112.     Upon information and belief, additional facts which support this Count exist, but are in the exclusive possession, custody and control of Defendant. As such, additional discovery is needed to amplify these facts.

## COUNT SEVEN

### (Accounting)

113.    Plaintiff repeats and realleges paragraphs 1. through 112. as if fully set forth herein.

114.    Plaintiff is entitled to an equitable accounting of the worldwide profits derived from the infringement.

115.    Such accounting should include for all periods from the commencement of the infringement a complete accounting of the business and affairs of the Defendant, specifically with respect to monies earned on their Top Hat Logo and related branding apparel, tattooing, and paraphernalia worldwide. Such accounting should include for all periods from the commencement of the infringement, without limitation, profit and loss statements of the Defendant, balance sheets of the Defendant at the end of each accounting period and related statements of retained earnings and cash flows.

116.    Such accounting should include for all periods from the commencement of the infringement a listing of all receipts and disbursements made and the original vouchers, bills, receipts and cancelled checks, as well as a complete and detailed listing of any and all payments, disbursements or other allocation of funds made to any individual or entity related to, or in a control relationship with, the Defendant. Such accounting should include for all periods from the commencement of the infringement all such other information as may be necessary or desirable to determine the profits derived from the infringement.

WHEREFORE, based on the aforesaid, Plaintiff demands judgment against the Defendant on all causes of action and prays for accounting of the profits derived from the infringement, damages, including compensatory damages and punitive damages, prejudgment interest, attorneys' fees, costs and disbursements, all in an amount to be determined at trial.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: April 14, 2011
Orangeburg, New York

KEVIN T. MULHEARN, P.C.

By:

Kevin T. Mulhearn (KM-2301)
60 Dutch Hill Road, Suite 8
Orangeburg, New York 10962
(845) 398-0361
*Attorneys for Plaintiff*

# LIST OF EXHIBITS

| Exhibit | Description |
| --- | --- |
| A | Rob Wallace Expert Report |
| A-1 | Timurlogo |
| A-2 | LogoInUse |
| A-3 | "MeisteP" Crest |
| A-4 | CAPRINI |
| A-5 | Superimposed Logo |
| B | Casey Stengel Photograph using Timur Logo **"1P03"** |
| C | Cropped Casey Stengel Photograph using Timur Logo **"1P03"** |

**EXHIBIT A**

Confidential
Subject to Protective Order

A.    Assignment

I have been asked by Kevin Mulhearn of Kevin T. Mulhearn, P.C. to analyze the materials in question and to determine the similarity between the top hat logo that Kenneth Timur created for The New York Yankees (Exhibit 1) and the logo that The New York Yankees have currently in use and in broad distribution (Exhibit 2). I have also been asked to opine on the likelihood that the logo currently in use was derived from the Timur logo. Lastly, I was also asked to determine the relevance of Timur's "signature P" on the 1P03 Casey Stengel Patch logo and uniform patch (Exhibit 1) as an indication of the Kenneth Timur's authorship of this logo and as evidence that the Timur logo pre-existed the New York Yankees logo currently in use.

B.    Analysis of the Kenneth Timur Logo versus the Logo in Use

In the remainder of this report I will refer to the Timur created top hat logo for The New York Yankees (Exhibit 1) as "the Timur logo". I will refer to the logo that The New York Yankees have currently in use and in broad distribution (Exhibit 2) as "logo in use".

In my analysis of these two logos, I find it unmistakably evident that they are so significantly similar that they could be easily be interpreted as being the same logo.

There are subtle differences between these two logos. For example, the brim of the top hat used in the Timur logo is turned upwards, while the hat brim of the logo in use is down turned. There are subtle differences in the stars and stripes on the top hat used by both logos. And the orientation of the top hat elements are slightly more upright on the Timur logo and more turned to the right of vertical on the logo in use.

However, these subtle differences are dramatically outweighed by the exceptionally large number of similarities shared between these logos. While only roughly half of the full Timur logo is depicted in the exhibit, it is still evident that there are many relevant similarities between it and the logo in use. Not only are there many similar elements shared by both logos, but also the degree of their exceptional similarity makes these logos even more indistinguishable. More than several elements of both logos are exceptionally similar, if not identical, in their size, their layout and their proximity to one another. For example, both logos are contained within a circle using distinctive line work and stitching to represent that of a baseball. Based on the "Y" and "a" visible in the Timur logo, it seems that both logos use an almost identical and very distinctive scripted type style for the word "Yankees". This almost identical scripted type style is located at the bottom of the circular baseball element for both logos. The location and orientation of the top hat is again exceptionally similar between both logos. Both top hats are flared at the top, tampering to a smaller dimension at the headband. Both top hats use stripes that run vertically from the top of the hat to the hatband. The hatband on both logos has white stars on them against a dark background. And all of these elements are contained with in a bold circular line that emanates from the letter "Y" creating the outer dimension of the baseball holding device.

In addition to the great similarity in the number of elements, their size and orientation to one another, the actual elements themselves are significantly similar. The hand lettered

Confidential

Subject to Protective Order

type style of the word "Yankees" is virtually identical across both logos. The location of the stars and stripes on the hatband are again virtually identical.

Because of these significant similarities, the resulting overall visual image of both logos is that they come from the same source. In my more than twenty eight years as a brand identity design strategist, I have attended literally hundreds of hours of consumer research. It is my firm opinion that if provided as visual stimuli to consumers, the overwhelming majority would state that these logos are, in fact, the same image. Specifically because of the number of and extent of the similarities between these logos it is my further educated opinion that no consumer research would be required to validate this conclusion.

C.      Relevance of the Timur Signature "P" on the 1P03 Casey Stengel Patch Logo

I was provided with a photograph of Casey Stengel (Exhibit 1), the manager coach of The New York Yankees during this 50th anniversary year. I was told that Timur was commissioned by the New York Yankees to create this logo. This photo shows Stengel wearing this logo in a patch on the left sleeve of his Yankees uniform.

This patch logo has a ring around its outer dimension with the year of The New York Yankees' origin in New York City, 1903. However, this patch has a very distinctive feature. Rather than using the number "9" in what would logically be a description of the year of The New York Yankees origin in New York City, this number has been replaced with the letter "P", resulting in the very distinctive "1P03" image.

I was informed that this letter "P" is a distinctive "signature" that Kenneth Timur used in his artwork.   I have seen other pieces of Timur's artwork, including the "MeisteP" crest (Exhibit 3) which he signed with his name and with his distinct visual signature, the letter "P". In the case of the "MeisteP" crest, he used a "P" rather than an "R" which I was told was the correct spelling of the Meister family name.

In the art and design world, artists often sign their work or signify it with a distinctive character, mark or image. This is often the case in fine art, with many artists signing their name to their works, such as Rembrandt.  This practice also occurs in commercial art.  For example, in much of his commercial art for the Saturday Evening Post, Normal Rockwell used a specific typeface as his unique "signature".

I learned that Kenneth Timur used the letter "P" as his signature mark on some of his artwork.  I have seen this distinctive "P" incorporated into elements of his commercial art like the "MeisteP" crest as well as renderings of his fine art such as A VIEW FROM CAPRINI HOSPITAL 19th ST FLOOR 624 MANHATTAN 2-5-95 (Exhibit 4).

As the owner of a graphic design firm I understand what clients require and what they will approve.  It is evident to me that The New York Yankees intentionally allowed and approved Kenneth Timur's distinctive "P" mark to be incorporated into the 1P03 patch logo.  It is exceptionally unlikely that the New York Yankees organization would have accepted this

Confidential

Subject to Protective Order

master artwork and its implementation into uniform patches had The New York Yankees organization not specifically intended to have Kenneth Timur's distinctive "P" as part of the patch logo. This seems to be more than significant evidence that The New York Yankees understood the value of including Timur's distinctive "P" signature on their logo and uniform patch. It could not have been done accidentally.

D.      Derivation Conclusion

It is unmistakably clear that the Timur logo and the logo in use are so significantly similar that they could not have been created independently from one another. One is clearly derived from the other. If, in fact, the Timur logo predates the logo in use, then the logo in use is an unmistakable derivation of the Timur original. Furthermore, in my experience, there is an exceptionally strong likelihood that consumers would assume these logos as coming from the same source, if not, in fact, being the same image.

The presence of the Timur "signature P" in the patch logo seems to be relevant evidence that The New York Yankees association had every intention of allowing Timur's distinctive "P" signature to appear on the logo, possibly as a way of acknowledging Timur's work and its contribution to The New York Yankees brand.

E.      Exhibits/Materials Reviewed

My opinion above is based on an analysis of the provided materials, a number of discussions with Mr. Kevin Mulhearn and Ms. Tanit Buday and my deep knowledge of the brand identity design industry.

I have no knowledge of any financial arrangement made between Kenneth Timur and The New York Yankees. I do not know if the New York Yankees commissioned the Timur logo, nor paid for its unconditional usage. I obviously did not witness any of the artwork in question being created, nor do I have knowledge of what logo pre-dated the other. Beyond the exhibits presented to me, I also have no knowledge of the predominance of Timur's "signature P", nor its notoriety or recognition value. I have not been asked to opine on these issues. Rather, I have been asked to analyze the Timur logo and the logo in use in order to determine their similarity and the likelihood that one was derived from the other.

This report represents my opinions based upon the materials and information I have reviewed as shown in Appendix 1. If additional materials or information come to my attention, I reserve the right to revise or supplement the opinions and/or bases for the opinions set forth in this report.

Confidential

Subject to Protective Order

F.     Analysis Methodology

I scanned the artwork provided so as to create a digital image of the Timur logo and the logo in use. Using design software I then superimposed one logo over the other without changing the size of the elements within them. Please see this artwork as Exhibit 5. This provided me a more empirical understanding of the great number of similarities between these logos and the significant extent of their similarity.

G.     Qualifications

As the Managing Partner of Wallace Church Inc., one of the nation's most recognized and accomplished global brand identity strategy and design consultancies, I have had unique experience that supports my expertise in how brand communication impacts consumer awareness.

Brand identity strategy and design is a discipline that counsels marketing management on how to develop a unique, proprietary, and ownable brand and corporate perception with their consumers.  Specifically it involves shaping a brand's message and its image so as to be compelling, relevant, and meaningfully distinct from that of any other brand.  Among other things, it involves developing, analyzing, and researching the visual and perceptual cues that best establish meaningful differentiation between brands.  The outcome of this process includes logo design, signage design, package design, merchandising design, advertising and all other visual and tactile consumer communications.

Prior to joining Wallace Church more than 28 years ago, I worked at Grey Advertising, one of the world's largest advertising agencies.  I then worked in three additional advertising and marketing communications consultancies before joining Wallace Church.  Please see a copy of my *curriculum vitae* attached in Appendix 2.

I have consulted with over 50 of the largest and most prestigious consumer product companies on developing packaging for their highest profile global brands.  My current and recent clients include P&G, Coca-Cola, Unilever, Nestlé, Kraft, Kellogg, Colgate-Palmolive, Reckitt Benckiser, Novartis, Pfizer, Dell Computer, and over 40 corporations of equal caliber. I have consulted directly with a number of sporting goods brands, including Maxfli, Top Flite, Taylor Made, Russell Athletic and many others.  I have not consulted with the New York Yankees or other professional sports teams, but my expertise in brand identity would not depend upon working with these organizations.

Confidential

Subject to Protective Order

In my capacity at Wallace Church, I have been directly involved in the perceptual positioning of products, developing brand names, directing the development of brand and corporate logos, package designs, coordinating, planning and developing the stimuli for consumer research, attending this research and analyzing its results, designing consumer communications, synthesizing this brand identity strategy with advertising and all other consumer communications and a number of other branding activities.

As part of my experience I have attended literally hundreds of hours of consumer research sessions across dozens of brand categories. Having witnessed and analyzed this significant amount of consumer interaction with brand identity visual stimuli, I am qualified to opine on the anticipated consumer perceptions that would be generated by visual stimuli.

I am a published author. I have coauthored a book entitled "Really Good Packaging Explained", which was released in late 2009 by Rockport Publishers. I have also written a number of brand identity articles, contributed to branding texts, and have been interviewed by The Wall Street Journal, The New York Times, and more than several marketing communications industry publications. I have spoken at more than 30 marketing communications and design industry events across North and South America, the UK, Europe and Asia. I have lectured on brand identity at Columbia Business School, Georgetown University, the University of Texas, Seton Hall University and other leading universities. I am on the board of advisors of the Design Management Institute and a Distinguished Faculty Member of the In-Store Marketing Institute. Please see my current curriculum vitae for a listing of these and other brand identity industry related accomplishments

Confidential

Subject to Protective Order

In the past 10 years I have written the following articles among others:

- "The Tropicana Trouble and How It May Have Been Prevented," Package Digest, 2009
- "Blood, Sweat and Tiers, Building Optimal Brand Identity Architectures," GAIN, AIGA Journal of Business and Design, June 2008
- "Heinz Turns Iconic Authenticity Into Fresh Relevance," The Hub, September 2007
- "Design ROI Envisioned," Step Inside Design, July/August 2007
- "Be Smart Be Simple," Design Management Review, Spring 2006
- "Proving our Value: Measuring Package Design's Return on Investment," Design Management Journal, Summer 2001
- "The High Cost of Saving Money," Package Digest, Summer 2000
- "Icons, Your Brand's Visual Essence," Brandweek, Spring 2000

I have coauthored an article with Pamela De Cesare, former Associate Director of Package Communications, Kraft Foods, Inc., entitled "Amazing Pace, Shared Views on the Design Process," Design Management Journal, Spring 2000.

H.  Hourly Rate

The fee for my consulting and developing my expert witness report in this case is $400 per hour. The fee for my attendance at depositions and trial in this case is $500 per hour.

I declare under penalty of perjury that the foregoing is true and correct.


Rob Wallace            Dated: February 21, 2011

Confidential

Subject to Protective Order

Appendix 1: Exhibits

The following exhibits were created in order to determine the proportionate sizes of each
relevant element and are attached to the digital copy of this report.

Exhibit 1:  Timurlogo
Exhibit 2:  LogoInUse
Exhibit 3:  "MeisteP" Crest
Exhibit 4:  CAPRINI
Exhibit 5:  Super Imposed Logo



Confidential

Subject to Protective Order

Appendix 2: Rob Wallace CV

CURRICULUM VITAE

# Rob Wallace

Wallace Church, Inc.
330 East 48 Street
New York, NY 10017
t. 212-755-2903 f. 212-355-6872 c.917-860-0319
rob@wallacechurch.com
www.wallacechurch.com

## Summary

As the managing partner of Wallace Church, Inc., one of the most recognized and accomplished strategic brand identity strategy and design consultancies, I have more than twenty years of expertise in all aspects of visual branding strategy and design analysis for national and global brands. My core expertise is the ability to create and differentiate brand experiences that drive consumer purchase behavior.

## Profile

**Areas of Expertise:**

| | | |
|---|---|---|
| Trademark/Trade Dress | Marketing Strategy | Copyright Damages |
| Package/Product Design | Licensing | Consumer Research |
| Intellectual Property | Visual Brand Identity | Planning/Analysis |
| Brand Communications | Advertising Claims | |

**Industry Experience:**

| | |
|---|---|
| Food | Hard Goods |
| Beverage | Beer/Spirits |
| Personal Care | Confections |
| OTC and Rx Drugs | Apparel |
| Home Products | Retailer Brands |
| HBA/Beauty Care | |
| Wellness | |
| Sporting Goods | |

## Experience

**Wallace Church, Inc.,** New York, NY                                      1985 -
Present
Managing Partner, Strategy

- Actively manage one of the world's most respected brand identity design consultancies.
- Provide strategic consulting on all branding and design issues for clients.
- Target and establish new client relationships and optimize existing client partnerships.
- Clients include Procter & Gamble, Kraft, Nestle, Kodak, Gillette, Brown Foreman, Johnson & Johnson and more than 30 national/global consumer product marketers of equal caliber.

**Peter Cris Associates, Inc.,** New York, NY
1984 - 1985
Vice President, Marketing

- Provided both the strategic and creative force for this regional advertising agency.
- Acted as primary liaison between clients and creative department.

**Modular Marketing, Inc.,** New York, NY                                   1982 -
1984
Senior Account Manager

- Managed select client relationships through all creative and strategic aspects of project management for this marketing communications consultancy.
- Designed and developed brand promotion programs, corporate communications and brand identity assignments.

**Grey Advertising, Inc.,** New York, NY                                     1981 -
1982
Account Manager

- Actively participated in one of the world's largest advertising agencies through the Market Horizons function, consulting with core clients on advertising and new brand communications opportunities.

## Education

MBA coursework, The New School, New York, NY                                1981 -
1983

BA, English, Gettysburg College, Gettysburg, PA                            1977 -
1981

## *Professional Memberships*

Design Management Institute, Board of Advisors
In-Store Marketing Association, Distinguished Faculty
Color Marketing Group
Shelf Impact Magazine, Board of Advisors,
American Marketing Association
Association of Professional Design Firms
American Institute of Graphic Arts

## *Professional Activities*

- Board of Advisors, Design Management Institute, Shelf Impact Magazine
- Lecturer on brand identity at Columbia Business School, Georgetown University, UNT, Seton Hall University and other leading universities
- Distinguished Faculty Member, In Store Marketing Institute, speaker at national conference for last 8 years
- Frequent speaker on brand identity design at the Institute for International Research, HBA Industry Summit, Design Management Institute and more than several other marketing, design and research industry events
- Author of numerous articles and published case histories on brand identity design in the Design Management Journal, Package Design Magazine, POP Times Magazine, Brandweek, Wall Street Journal
- Co Author "Really Good Package Design Explained, Rockport Press, Release June 09

**EXHIBIT A-1**



**EXHIBIT A-2**



**Logo In Use since 1936**

**EXHIBIT A-3**



**EXHIBIT A-4**



MY VIEW FROM
CAPRINI
HOSPITAL
19th St. FLOOR 124
MANHATTAN



**EXHIBIT B**



## STENGELESE *(continued)*

"He's dead at the present time."

> —Quoted by Berry Stainback in *Sport*, April 1966.
> Stengel was referring to Boston Braves outfielder Larry
> Gilbert, who died in 1965

"He's great but you gotta play him in a cage."

> —On Jimmy Piersall, quoted in *Everything You Always
> Wanted to Know About Sports and Didn't Know
> Where to Ask* by Mickey Herskowitz and Steve
> Perkins. Because of Piersall's problems—described in
> his *Fear Strikes Out*—this line has been cited as
> evidence of Stengel's cruelty to his own players.

"He's throwing grounders."

> —On a pitcher who was wild and low

"Hey, Heffner, take 'em down to that other field
and find out if they can play on the road."

> —Directive to coach Don Heffner during spring
> training at the expansive St. Petersburg facility, 1963

"Hi, I'm Dutch Stengel. I'm a new player on this
team. I'd like to take batting practice."

> —When he reported to the Brooklyn Dodgers in 1912,
> rookies were not permitted to take batting practice.
> Casey, an avid batsman, had cards printed up with this
> terse message, which he handed to his teammates.
> Quoted in "Memories of Casey—and Stengelese," in
> the *San Francisco Examiner*, September 30, 1975.

**Casey Stengel as Yankee manager.** *New York Yankees.*



"Hornsby could run like anything but not like
this kid. Cobb was the fastest I ever saw for bein'
sensational on the bases but he wasn't a long
hitter. They're been a lot of fast men but none as
big and strong as Mantle. He's gonna be around a
long time, if he can stay well, that fella of mine."

> —Early assessment of Mickey Mantle as the fastest
> slugger he ever saw, Hall of Fame Collection

"How can a guy who's so big and strong hit the
ball so near?"

> —On watching the immense Washington Senator
> Frank Howard take a mighty swing at a ball that
> dribbled into the infield, quoted in *Baseball Digest*,
> March 1965

"How the hell should I know? Most of the people
my age are dead."

> —On being asked by a reporter what people "your
> age" thought of modern-day ballplayers or, depending
> on the source, being asked about his future. It appears
> to date from the spring of 1965. Later versions of this
> Stengelism often appeared as part of longer quotations,
> such as this on the subject of his age: "Just say I'm a
> man that's been around for a while, a man that's been
> up and down, a man that's played with the dead ball
> and the lively ball and lived to tell the difference.
> Why, most people my age are dead now and you can
> look it up."

"I ain't gonna comment about a guy which made
$100,000 writin' how my club lost."

> —When asked to comment on Douglass Wallop's
> *Damn Yankees*, quoted in Bennett Cerf's *Life of the
> Party*

"I broke in with four hits and the writers
promptly decided they had seen the new Ty
Cobb. It took me only a few days to correct that
impression."

> —Widely attributed

"I can make a living telling the truth!"

> —Oft-used line according to George Vecsey, the *New
> York Times*, September 20, 1981

"I couldna done it without my players."

> —On winning the 1958 World Series as Yankee
> manager

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

TANIT BUDAY,

               *Plaintiff,*

 - *against* -


NEW YORK YANKEES PARTNERSHIP, an
Ohio Limited Partnership,

               *Defendant.*

---

# COMPLAINT

---

**KEVIN T. MULHEARN, P.C.**
*Attorneys for Plaintiff*
*Office Address & Tel. No.:*
*60 Dutch Hill Road, Suite 8*
*Orangeburg, New York 10962*
*(845) 398-0361*